IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| DANA TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04-276-KI |
| | ) | |
| vs. | ) | OPINION |
| | ) | |
| DAVID E. HALLBERG; and NORA A. MULLANE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAVID E. HALLBERG and NORA A. MULLANE, | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF PORTLAND, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

Charles J. Merten
Gus Solomon Courthouse
620 S. W. Main Street, Suite 615
Portland, Oregon 97205-3037

    Attorney for Plaintiff

Craig A. Crispin
Patty T. Rissberger
Crispin Employment Lawyers
500 Plaza West, 9600 S. W. Oak Street
Portland, Oregon 97223

    Attorney for Defendant/Third-Party Plaintiff

David A. Landrum
Deputy City Attorney
Office of City Attorney
1221 S. W. Fourth Avenue, Room 430
Portland, Oregon 97204

    Attorney for Third-Party Defendant City of Portland

KING, Judge:

Plaintiff Dana Turner alleges that defendant David Hallberg, an employee of the City of Portland's ("City") Bureau of Development Services, targeted her home for numerous inspections for nonexistent or insignificant code violations which resulted in fines. When Turner could no longer deal with the alleged harassment, she allowed her mortgage company to foreclose. The lender sold the house to an intermediary, who immediately sold it to Hallberg, who resold it seven months later for nearly three times what he paid.[1]

---

[1] Evidence to support this statement was filed in the first round of summary judgment motions. Hallberg's purchase of the house shortly after the foreclosure is supported by evidence currently before the court. I include the other information for background only.

PAGE 2 - OPINION

Turner originally alleged claims against Hallberg and his wife, Nora Mullane, another City employee. Hallberg and Mullane filed third-party complaints against the City, alleging that it wrongfully denied their tenders of Turner's claims and asking the court to order the City to defend and indemnify them. On March 28, 2005, I dismissed all of Turner's claims but gave her leave to replead. In the Amended Complaint, Turner alleges claims only against Hallberg for constitutional violations and common law torts.

Before the court are Defendant Hallberg's Motion for Summary Judgment (#115), Third-Party Defendant City of Portland's Motion for Summary Judgment against Plaintiff's Amended Complaint (#121), and some related motions to strike. For the reasons below, I grant summary judgment against the constitutional right to travel claim and equal protection claim concerning the complaint-driven enforcement system.

## MOTIONS TO STRIKE

Turner moves against several pieces of evidence filed by Hallberg and the City. She moves against Hallberg's entire declaration because Hallberg is a party and not an uninterested witness. I deny this motion for the reasons I stated in the last Opinion.

I deny Turner's motion to strike Hallberg's testimony about receiving complaints from Turner's neighbors. The identification of the complainants by their initials is a valid way to protect their privacy. No more is needed for summary judgment motions.

I deny Turner's motion to strike the entire Schmidt Affidavit. As a Senior Financial Analyst in the City Auditor's Office who reviewed the lien assessment records maintained in the normal course of business in the Auditor's Office, Schmidt has adequately authenticated the

exhibits, shown that they are business records, and has personal knowledge to explain the meaning of the exhibits.

Likewise, I deny Turner's motion to strike the exhibits attached to the Marihart Affidavit. Marihart, as an Inspection Supervisor, can testify about the meaning of the documents associated with the 20 code violations and nuisance cases associated with Turner's house, can authenticate them, and can show that they are business records.

All other parts of the motions to strike are moot because the evidence is not relevant to my analysis or it was filed and authenticated by another party.

## FACTS

Plaintiff Dana Turner bought the house at 865 N. Terry in Portland, Oregon, in January 2000 and lived there with her four children and two grandchildren. Turner had lived in the house for many years before she bought it.

David Hallberg is a housing inspector. On April 26, 2000, Hallberg inspected Turner's house after receiving a complaint from her neighbor. Over the next 19 months, Hallberg received 11 additional complaints from three neighbors, plus a few more complaints for which Hallberg does not have records because he answered the telephone call directly rather than receiving a voice mail. Hallberg did not self-initiate any inspection of Turner's house. Hallberg only had one conversation with Turner during his visits to the house. He cited the house for trash and debris in the yard, overgrown grass and weeds, broken windows, windows too small for sleeping rooms, and neglected vehicles on site.

Turner states that the violations were minimal, a newspaper blown into the yard and small bits of food that spilled out of the garbage can, and did not bring the house below the standards

of the neighborhood. She also states that her windows are bigger than windows on the house across the street. When Turner told this to Hallberg, he told her that it did not matter because he was inspecting her house and not her neighbors. Hallberg told Turner that fines would be imposed every month until she complied.

When Turner told Hallberg that she could not afford the fines, Hallberg gave his standard response to homeowners with money problems: fix the house herself, borrow the money, sell the house, or find someone to assist with the repairs. Hallberg told Turner that he would enforce the code every month. Turner took his statement as an offer to buy her house but she was not interested. Turner complained to Scott Elerson, another City employee, that Hallberg was harassing her and had asked her why she did not sell the house. She also told Elerson that three or four other houses in the neighborhood had windows the same size as hers. She wondered if the other houses were also getting fined. Elerson told Turner that he would look into it but Turner is unaware of anything happening from her complaint.

Hallberg returned every month to reinspect Turner's house, sometimes bringing other people with him. Other field officers conducted the nuisance abatement activities, including bringing in contractors. One inspector brought a backhoe to remove newspaper bundles. The backhoe damaged Turner's driveway. Turner states that Hallberg continued to cite her for transitory things that were small and petty. He once sent someone to mow her back lawn and bill Turner for the work. She also saw him talking frequently to a neighbor that did not like Turner's family. Soon after, the police would come to Turner's house to tell her that the house was going to be boarded up, or animal control came claiming the dog was loose, or another housing inspector would come.

Turner never appealed any of the citations or liens. She did not realize that she could challenge Hallberg's actions.

Turner's mortgage payments were $815 per month. She earned between $1,000 and $1,200 per month, and more at times from child support, rent from a roommate, and income from her new business, until she became unemployed in August 2000. At the end of 2000, Turner had no income other than $400 a month for child support. Her son and son's father paid the mortgage from November 2000 through February 2001, at which time her son's father moved out of the house and ceased making payments. By May 2001, Turner's son had also moved out, dropping her monthly income to about $800. Turner made no mortgage payments after May 2001 because she spent her limited income on the other household bills.

Turner received many notices from the City stating that she owed increasingly more money. She lost her jobs and struggled to take care of her family. The State threatened to remove some of her children. All of the stress caused Turner to attempt suicide. Hallberg, as well as other inspectors, kept citing Turner.

Turner's home had liens assessed against it in June 2000, for code enforcement, and September 2000, August 2001, and December 2001, for nuisance abatement. On April 18, 2002, the City Auditor faxed a payoff amount of $5,599.35 to a title company. Turner gave up trying to keep her house and let the lender foreclose. Hallberg never spoke to anyone at Turner's mortgage company until Turner was evicted and a real estate "For Sale" sign was posted. The lender foreclosed Turner's house in January 2002. In May 2002, Hallberg and Mullane purchased the house.

Edward Marihart, Inspection Supervisor with Neighborhood Inspections for the City, explained the violation process for Title 29, the City's property maintenance regulations. If an inspector finds a housing code violation, the owner and occupant are notified. If the violation is not corrected within 30 days, a code enforcement fee, which is also called a fine, is charged against the property. As an example, a first-month violation for a single-family house would have a fine of $90 plus a $32 recording fee for the notice of possible lien that is filed with Multnomah County. A few days later, a lien is assessed against the property on the city lien docket. Each additional month that the violation goes uncorrected, another $90 is fined. On the sixth uncorrected month, the fine is doubled to $180 per month. Twelve percent interest is also assessed as well as 10 percent charge from the City's auditor to cover costs. The case is closed if the violations are fixed and pass inspection. The City will set up a payment plan for the fees. If they are not paid within 12 months, the fees are considered delinquent and the auditor puts the property on the foreclosure list. The City's foreclosure process did not start until 2004, after Turner's house was foreclosed by her lender. Marihart does not remember any properties actually being foreclosed by the City for either housing code violations or nuisance abatements. The lien would have clouded the title.

A nuisance abatement is handled similarly. If the nuisance is not corrected after three inspections, the City hires a contractor to do the work. The property is assessed the amount of the contractor's charges, a $32 recording fee, a 40 percent overhead to cover the City's costs, and a $300 civil penalty for a first time offense. If payment is not made within two weeks, there is an additional 10 percent assessment fee and a lien against the property, along with the 12 percent interest.

Marihart explained that inspections are about 95 percent complaint-driven and 5 percent self-initiated by an inspector who noticed a problem. Most of the self-initiated complaints are for serious safety or sanitation nuisances and not for housing violations.

**LEGAL STANDARDS**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

I.  Equal Protection

Turner alleges two claims under the Equal Protection Clause: (1) that Hallberg selectively enforced the housing code only against those properties for which someone complained; and (2) that Hallberg selectively enforced the housing code against Turner's property to force her to abandon it so that he could purchase the house.

Defendants first return to their argument that Turner's lender foreclosed on her home because she did not make mortgage payments for several months, and not for any reason associated with enforcement of the housing code or the City's liens against her house. For the

reasons stated in my prior Opinion, I decline to grant summary judgment based on this causation argument.

### A. Selective Enforcement in Complaint-Driven System

The City argues that because Turner does not claim her rights were violated because she is a member of a suspect class, she is in a "class of one" for which the rational relationship test would apply. The City contends that there is a rational basis for its enforcement policy being driven to a large extent by complaints. Turner counters that defendants have not proffered the reason housing code violations are complaint driven.

During the oral argument, the City contended that it uses a complaint-driven enforcement scheme because of resource limitations. Although this makes sense, I find no proof for the argument in the portion of Marihart's declaration that is filed with the court. This is not fatal to the City's argument on summary judgment, however. The case law speaks of government defendants "asserting," rather than proving, their rationales. See Armendariz v. Penman, 75 F.3d 1311, 1326, 1327 (9th Cir. 1996) ("The City has an obvious interest in preventing safety and sanitation hazards by enforcing the housing code."). See also Wedges/Ledges of California, Inc., v. City of Phoenix, Arizona, 24 F.3d 56, 66 (9th Cir. 1994) (in a substantive due process claim, "When reviewing the substance of legislation or governmental action that does not impinge on fundamental rights, moreover, we do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did.").

Turning to the merits of the claim:

> The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The equal protection guarantee protects not only groups, but individuals who would constitute a "class of one." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000). Where, as here, state action does not implicate a fundamental right or a suspect classification, the plaintiff can establish a "class of one" equal protection claim by demonstrating that it has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook, 528 U.S. at 564, 120 S. Ct. 1073. Where an equal protection claim is based on selective enforcement of valid laws, a plaintiff can show that the defendants' rational basis for selectively enforcing the law is a pretext for an impermissible motive.
>
> . . . .
>
> Disparate government treatment will survive rational basis scrutiny as long as it bears a rational relation to a legitimate state interest. Although selective enforcement of valid laws, without more, does not make the defendants' action irrational, there is no rational basis for state action that is malicious, irrational or plainly arbitrary.

Squaw Valley Development Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004) (some internal quotations and citations omitted). On summary judgment, an equal protection plaintiff may show pretext by creating a triable issue of fact that either the proffered rational basis was objectively false or that defendant actually acted based on an improper motive. Id. at 946.

In this claim, Turner belongs to the class of owners of property against which someone lodged a complaint. As everyone in Portland is aware, the City, County, and State all have very limited budgets. Reliance on a complaint-driven enforcement scheme is based on the assumption that the worst-offending properties will draw complaints. For the well-being of the neighborhoods, those are the properties that deserve the most attention from the housing inspectors. Thus, there is a rational relation to a legitimate state interest.

PAGE 10 - OPINION

To survive summary judgment on this claim, Turner must show that there is a factual issue on whether the complaint-driven enforcement scheme is a pretext for an impermissible motive. I caution that the City, and not just Hallberg, uses this scheme. Thus, Hallberg's purchase of Turner's home is not relevant to this claim. Turner argues that the jury can infer that the actual motive is to avoid public criticism of the Commissioner in charge. She provides no evidence to support this argument, however. I also am not sure I understand the impermissible nature of the proffered motive. If the housing inspections are appropriately done and the City's housing stock is kept up to par, the Commissioner would not be criticized.

I conclude as a matter of law that the enforcement scheme has a rational basis and that Turner has not shown a factual issue concerning pretext. Consequently, I grant summary judgment and dismiss the equal protection claim concerning the complaint-driven enforcement scheme.

B. <u>Selective Enforcement to Force Abandonment</u>

Hallberg contends that Turner cannot prove that she was treated differently from others similarly situated, specifically that there is no evidence that Hallberg did not cite other houses brought to his attention by neighbors that had the number and severity of violations as Turner's property. Hallberg claims that there is no evidence that any of the nuisance or housing postings against Turner's home were invalid or that they were pretextual because he had an improper motive. Concerning his purchase of the house, Hallberg notes that he did not offer to purchase it directly from Turner and only bought it when it was for sale to the general public.

Turner contends that her home was no worse than others in the neighborhood, particularly when she was first cited, and notes that she complained to him about the size of a window in one neighbor's home.

In this "class of one" claim, Turner is entitled to the inference that she complained about a neighbor's home and it was never inspected. Although I agree that the evidence is minimal, it is enough to create a factual issue on whether her property was treated differently from other similarly situated properties. Moreover, the fact that Hallberg told Turner that one way to resolve the violations without investing money to correct them was to sell the home, and then immediately purchased Turner's home after the foreclosure, raises a factual issue that his motive for citing her home was pretextual. This is the case even though there is no evidence that the citations were invalid. I agree that Turner would have a stronger case if Hallberg purchased the home directly from her rather than through a real estate agent after foreclosure, but the timing is so close that his method does not sanitize the purchase from the conflict of interest.

Thus, this claim will proceed to trial unless Hallberg is protected from liability by qualified immunity.

Courts use a three-step test to determine if a defendant is entitled to qualified immunity on a federal constitutional claim. First, the court determines if the facts alleged, viewed in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a constitutional right. Brown v. Li, 308 F.3d 939, 946-47 (9th Cir. 2002), cert. denied, 538 U.S. 908 (2003) (relying on Saucier). If the facts show a constitutional violation, the court decides if the constitutional right at stake was clearly established at the time of the alleged violation. If so, the final inquiry is whether an objectively reasonable government actor would have known that

his conduct violated the plaintiff's constitutional right. Id. at 947. Plaintiff has the burden of proving that a right is clearly established. Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002).

Here, I decided above that Turner could prove that Hallberg violated her right to equal protection. Hallberg first inspected Turner's home in April 2000. Willowbrook was decided in February 2000 and cites to cases decided as early as 1923 which recognize equal protection claims for a "class of one." Thus, I also conclude that the law is clearly established. Finally, an objectively reasonable government actor would have known that selectively enforcing the housing code to force someone from their home so that it can be purchased violates the Equal Protection Clause. Consequently, Hallberg is not entitled to qualified immunity.

In summary, I deny summary judgment against the equal protection claim that Hallberg selectively enforced the housing code to force Turner from her home.

II.   Right to Travel

Turner alleges that Hallberg's conduct violated her constitutional right to travel.

> The word "travel" is not found in the text of the Constitution. Yet the "constitutional right to travel from one State to another" is firmly embedded in our jurisprudence.
>
> . . . .
>
> The "right to travel" discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

Saenz v. Roe, 526 U.S. 489, 498, 500, 119 S. Ct. 1518 (1999) (striking down California law that limits welfare benefits available to newly arrived residents to the amount payable by the State of the family's prior residence).

Turner contends that the constitutional right to travel includes the right to stay put, which Turner argues is the right to stay put in her home. She cites cases discussing the constitutionality of loitering ordinances, such as Chicago v. Morales, 527 U.S. 41 (1999), which struck down a Chicago ordinance prohibiting criminal street gang members from loitering with one another or with other people in any public place. The Court concluded that the ordinance violated due process because it was unconstitutionally vague. Id. at 51. In its analysis, the Court reasoned:

> [T]he freedom to loiter for innocent purposes is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment. We have expressly identified this right to remove from one place to another according to inclination as an attribute of personal liberty protected by the Constitution. Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part of our heritage, or the right to move to whatsoever place one's own inclination may direct identified in Blackstone's Commentaries.

Id. at 53-54 (section of opinion joined by three justices).

It would be quite a stretch to get from a loitering ordinance's violation of the Due Process Clause to Hallberg's conduct violating Turner's right to travel, a constitutional right which has always been discussed in terms of people moving between states. I am unpersuaded by Turner's analogy. Accordingly, I grant summary judgment and dismiss her § 1983 claim based on the right to travel.

III.   Intentional Infliction of Emotional Distress

Hallberg contends that Turner's intentional infliction of emotional distress is barred by the two-year statute of limitations under ORS 12.110(1) because their only conversation was in April 2000. Turner's Complaint was filed in February 2004 and amended in April 2005.

I first note that the claims in the Amended Complaint relate back to the date of the original Complaint under Federal Rule of Civil Procedure 15(c) because they arise "out of the conduct, transaction, or occurrence set forth" in the original Complaint. Under the discovery rule, the statute of limitations begins to run "when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation, and tortious conduct) exists." Doe v. American Red Cross, 322 Or. 502, 512, 910 P.2d 364 (1996) (internal quotation omitted).

Turner contends that she did not have notice that Hallberg's conduct was tortious until the City told her so in October 2003. Hallberg does not argue otherwise. I also conclude that the date of Turner's and Hallberg's conversation does not start the clock on the statute of limitations. Hallberg cited Turner numerous times without having a conversation about it. I find that Turner has at least raised a factual issue that she alleged this claim within two years of discovering it.

Alternatively, defendants argue that there is no evidence that Hallberg's conduct rises to the level required to support this tort and no evidence that Hallberg intended to inflict severe emotional distress or knew that his conduct was substantially certain to cause it.

The tort of intentional infliction of emotional distress contains the following elements:

(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

McGanty v. Staudenraus, 321 Or. 532, 543, 901 P.2d 841 (1995). Intent is defined to mean "where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct." Id. at 550 (emphasis omitted). The nature of the relationship between the parties affects the type of conduct that is considered actionable. Id. at 548.

"Conduct that is merely rude, boorish, tyrannical, churlish and mean [is insufficient to be actionable, and] . . . insults, harsh or intimidating words, or rude behavior ordinarily [do not] result in liability even when intended to cause distress." Watte v. Edgar Maeyens, Jr., 112 Or. App. 234, 239, 828 P.2d 479, 481 (1992) (quoting Hall v. The May Dept. Stores, 292 Or. 131, 135, 637 P.2d 126, 129 (1984)). In addition, Oregon cases which have allowed claims for intentional infliction of emotional distress to proceed typically involve acts of psychological and physical intimidation, racism, or sexual harassment. See Babick v. Oregon Arena Corp., 333 Or. 401, 413, 40 P.3d 1059 (2002) (defendant's release of intoxicated and violent concertgoers who had been detained by plaintiffs presented a threat of imminent physical harm that was presumed grave); Kraemer v. Harding, 159 Or. App. 90, 976 P.2d 1160 (1999) (continued accusations that a school bus driver was a child sex abuser after multiple investigations concluded that no inappropriate conduct occurred); Wheeler v. Marathon Printing, Inc., 157 Or. App. 290, 974 P.2d 207 (1998) (co-worker continued harassment including sexual remarks even after plaintiff

attempted suicide); Lathrope-Olson v. Dept. of Transportation, 128 Or. App. 405, 408, 876 P.2d 345 (1994) (calling a Native American woman a squaw, telling her that a squaw was supposed to walk behind her man, stating that all women were good for was between their legs, locking her out of the work van in the rain and snow, and threatening to push her into the path of oncoming vehicles); Mains v. II Morrow, Inc., 128 Or. App. 625, 877 P.2d 88 (1994) (daily physical assaults and sexual comments by supervisor); Franklin v. Portland Community College, 100 Or. App. 465, 787 P.2d 489 (1990) (supervisor called an African-American male by the name "boy," issued false reprimands, shoved him, locked him in an office, and suggested that he apply elsewhere for employment).

Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law. Harris v. Pameco Corp., 170 Or. App. 164, 171, 12 P.3d 524 (2000).

Turner's theory of the case is that Hallberg continued to cite her for housing violations until the stress caused her to give up fighting her financial difficulties and allow the lender to foreclose, thus allowing Hallberg to purchase the home. Hallberg's purchase of the house is sufficient evidence to allow inferences on which a jury could reach this conclusion. I find as a matter of law that use of the city housing code to force a person from their home for this reason is an extraordinary transgression of the bounds of socially tolerable conduct. I also conclude that Turner has raised a factual issue concerning whether Hallberg intended to cause her severe emotional distress. Accordingly, I deny granting summary judgment against the intentional infliction of emotional distress claim.

IV. Intentional Interference with Contract

Hallberg also contends that this claim is barred by the statute of limitations. I am not persuaded by this argument for the reason explained above.

Hallberg argues that because he had no contacts with Turner's lender until after the house went up for sale to the general public and she no longer lived there, there "is no basis for a finding that Hallberg interfered with a *third party*." Hallberg's Summ. J. Mem. at 13 (emphasis in the original). Hallberg misunderstands Turner's claim. She alleges that Hallberg is the third party who interfered with her contract with her lender. I also note that interference can be accomplished without speaking to the parties to the contract. Thus, the fact that Hallberg only had one conversation with Turner and never spoke to Turner's lender until the house was listed for sale does not require dismissal of the claim.

Defendants generally argue that Turner cannot prove the elements of this tort.

The elements of the torts of intentional interference with economic relations are: (1) the existence of a professional or business relationship, which could be a contract or a prospective economic advantage; (2) intentional interference with the relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. McGanty v. Staudenraus, 321 Or. 532, 535, 901 P.2d 841 (1995).

If liability is based on an improper purpose, the purpose must be to inflict injury on the plaintiff "as such." Northwest Natural Gas Co. v. Chase Gardens, Inc., 328 Or. 487, 498, 982 P.2d 1117 (1999) (internal quotation omitted). If liability is based on improper means, the means must violate "some objective, identifiable standard, such as a statute or other regulation, or a

PAGE 18 - OPINION

recognized rule of common law, or perhaps, an established standard of a trade or profession." Defendant's subjective judgment as to its own business purposes generally controls. Id.

Hallberg's purchase of Turner's home allows the inference that he cited her property to the extent that he did to force her from the house so he could buy it. Thus, Turner has raised a factual issue that Hallberg was acting with an improper purpose. As noted by Turner, I ruled in the last round of summary judgment motions that Turner has raised a factual issue that the citations, and not her poverty, caused her to allow the lender to foreclose. I will not revisit that decision now.

Defendants also argue that Hallberg cannot be liable for any interference with Turner's contract with her lender because he was promoting an interest equal or superior in social value to Turner's interest, thus making his conduct privileged. Defendants claim that Hallberg's purpose was to enforce the city housing code.

> A person who interferes with a contract is not always responsible for the resultant injury. If he is promoting an interest which is equal or superior in social value to that with which he interferes, his actions are said to be privileged or justified. The purpose or motive of the interferor may be the controlling factor in the determination of the existence of justification since it usually discloses the interest involved.
>
> . . . .
>
> On the other hand, there is no reason to protect corporate officers or employes who authorize, direct and participate in tortious conduct by their corporate principal. If the corporation commits a tort as a result of such intentional action on the part of its officers or employes, these agents are also responsible.

Wampler v. Palmerton, 250 Or. 65, 74, 77, 439 P.2d 601 (1968) (discussion concerning a corporate officer).

As with the intentional infliction claim, Turner has raised a factual issue that Hallberg was acting with the purpose of enriching himself. If she proves this, Hallberg would not be protected by a privilege. I deny the motions for summary judgment against the claim for intentional interference with a contract.

## CONCLUSION

Turner's Motion to Strike and/or Disregard the Contents of Affidavits and Declarations Supporting Summary Judgment against Plaintiff's Amended Complaint (#133) is denied in part and moot in part. Defendant Hallberg's Motion to Strike (#142) is moot. Defendant Hallberg's Motion for Summary Judgment (#115) and Third-Party Defendant City of Portland's Motion for Summary Judgment against Plaintiff's Amended Complaint (#121) are granted in part.

Dated this ____30th____ day of August, 2005.

                                                                  ___/s/ Garr M. King_____
                                                                   Garr M. King
                                                                   United States District Judge